BRILL v. DELAWARE COUNTY & P. ELECTRIC RY. CO.

(Circuit Court, E. D. Pennsylvania. June 15, 1901.)

No. 44.

1. PATENTS—INFRINGEMENT—ELECTRIC CAR TRUCKS.
    The Brill patents, Nos. 445,308, 461,662, 493,234, 503,121, and 507,207, relating to trucks for electric railroad cars, known as the "Maximum Traction Truck," considered, and *held* not anticipated, valid, and infringed.
2. SAME—SUIT FOR INFRINGEMENT—COSTS.
    Where a complainant alleges the infringement of a number of patents by the conjoint use by defendant of the several inventions, but, after defendant has taken his testimony on the issues joined, abandons a large proportion of the claims sued on, he may properly be taxed with a proportionate part of the costs, although successful as to the remaining claims.

In Equity. Suit for infringement of patents. On final hearing.

Joseph L. Levy, Francis Rawle, and Frederick P. Fish, for complainant.

Frank P. Prichard, for respondent.

J. B. McPHERSON, District Judge. The patents involved in this controversy have to do with trucks for electric passenger railway cars. The type of truck is the "Maximum Traction Truck," the characteristic features of which are thus described by complainant's expert upon pages 214 and 215 of complainant's proofs:

"First. Four wheels set upon two axles, so that the wheel base may be short, and the truck better adapted to round sharp curves without derailment.

"Second. The driven wheels should be of large size, relative to the other pair, so as to have a high axle, whereby space for a large motor may be afforded; and the side bearing plates and pivotal center of the truck should be over or near this axle, so that the greater part of the weight will be carried on it, and the radiation of these large wheels be as little as possible. And a portion of the weight should be applied to the small wheels, to hold them down upon the track.

"Third. The motor should be supported upon the axle of the driven wheels, so that its weight may contribute to the traction of those wheels, and its power applied to them.

"Fourth. There should be an axle-box frame (sometimes called side beams or bars), being substantial, strong side bars or beams, which are supported

upon the four axle boxes by parts called saddles, sometimes bolted to, and sometimes made integral with, the frame beams or trusses, so as to produce a strong, unyielding structure, whereby the axles are maintained in parallelism, the axle boxes suitably braced and supported, the endwise thrust of the axles resisted, and which may be used as a partial support for the motor. This frame likewise serves the important function of a foundation or underlying support for the main car springs.

"Fifth. Side and end bearing plates, which immediately support the car, and which are spring-supported on the axle-box frame.

"Sixth. The truck should be constructed in other respects so as to afford an unobstructed space between the axles for the motor, and so as to have a short wheel base; also so as to permit of a low-lying car body, whereby but few steps will be necessary, and large platforms secured. The brake mechanism should be so constructed as not to interfere with the motor space."

That the maximum traction truck has greatly improved the art is beyond dispute. Indeed, this truck may almost be said to have made electric traction possible and profitable upon the narrow streets of cities; and no patents, I think, have done so much to improve the art as the patents under consideration. The advantages gained by the use of the Maximum Traction Truck are summarized by one of the complainant's witnesses, who appeared to have an extensive acquaintance with the development of street-railway transportation, and to understand thoroughly the difficulties that were necessary to be overcome. He stated the advantages as follows, upon pages 163–165 of complainant's proofs:

"A large and long car, with large carrying capacity, with steadiness of motion, and consequent ease of riding for the passengers.

"Easy motion on the track, and consequently greatly decreased destructive action on the track and on the car body. No pitching nor rolling.

"The car body carried so low that access to the platform can be had with a single step (same height as four-wheel car).

"A narrow car body possible without increased elevation.

"Increased average speed in handling traffic, resulting from low car (with a reduction of liability to accidents) and from increased traction.

"The truck can be used under open cars as well as closed. (Interchangeable between winter and summer cars.)

"Entire center space of the truck open, in order to give easy access to the motor for inspection, repairs, and removal.

"All the traction possible compatible with the guidance of the trailing wheels.

"One motor only required for each truck.

"Large driving wheels, giving easy riding and economy of propulsion, with a high speed, and high axles, giving ample space for motors of increased size.

"Small trail wheels, making that end of the truck low, and permitting radiation on curves without striking the car sills or steps.

"Means to hold the small wheels down upon the track in order to prevent their climbing the track on curves or when meeting obstructions, and thus derailing the car.

"The necessity of absolutely preventing climbing on the side wheels cannot be overstated. They must be kept close down upon the rails, and particularly on curves. If allowed to climb, even by a small fraction of an inch, the force of the upward impact might easily increase the climbing enough to cause a derailment, and in rounding curves the trail wheels naturally tend to slide up the track when leading. This had been one of the serious objections to 4-wheel cars. To obviate it, their speed had to be reduced on curves to five or six miles an hour. In 8-wheel cars, with the greater part of the weight on the driven wheels, and a less amount on the trailing wheels, unless proper methods are used the danger of derailment on

the part of the small wheels would be greatly increased. To keep the trailing wheels upon the track, and enable them to guide them with safety, it is necessary that they should carry a portion—at least twenty per cent.—of the load.

"Total elimination of bolster mechanism.

"By the elimination of the bolster mechanism the entire space in the center of the truck between the axles may be secured for motor suspension, while retaining a short wheel base, enabling curves to be passed with little friction. This also gives less radiation of the trailing wheels.

"It is a generally recognized fact that the production of this truck has been as potent as any other single factor in the realization of the electrical transportation system as it exists to-day, and it is obviously not a transitory matter in any sense. On the contrary, it is here to stay.

"How important this type of truck is, may be judged from the fact that the Metropolitan Street-Railway system of New York City, which I believe has the largest volume of traffic of any street railway in the world, has adopted the Brill Maximum Traction Truck upon their lines.

"The Union Traction Company of Philadelphia is now lengthening its four-wheel car bodies and converting them into eight-wheel cars, and has recently ordered nearly 200 sets of Maximum Traction Trucks. The Brooklyn roads have adopted eight-wheel cars with the same type of trucks as their standard, and the Third Avenue road in New York is considering the adoption of large eight-wheel cars on its lines.

"The present tendencies in electric railways everywhere are distinctly towards the adoption of double-truck cars, to the exclusion of those mounted on four wheels. In the suburban traffic the four-wheeled car is almost obsolete.

"The most experienced railway men agree substantially that the eight-wheel cars are the best cars for the successful operation of the larger and longer roads, and new equipments are almost universally supplied with eight-wheel cars. There are, of course, a large number of modern four-wheel cars still in use, but this is probably due to the fact that the cost of re-equipping the lines on which they are used precludes a change while the present rolling stock is in good condition.

"I give the following approximate figures as to the changes from the street-car practice to the present electrical practice:

"Average weight of the old horse car was from 4,000 to 5,000 lbs.

"Average weight of an 8-wheel car with a 28-foot body (exclusive of platforms), 21,000 lbs.

"Maximum average number of passengers on the old horse car when crowded, 65.

"Average number of passengers on the 28-foot 8-wheel car, crowded, 130.

"Maximum speed of the old horse car, 6 miles an hour.

"Limit of speed of horse-car practice, say, 7 miles an hour.

"Rate of speed on suburban and interurban roads within the limits of common practice, 30 miles an hour, and even up to 55 and 60 miles per hour."

The five patents in dispute are Nos. 461,662, 445,308, 493,234, 507,207, and 503,121; and, of these, 44 claims are alleged to be infringed. The record is of unusual volume, and the questions are, I think, more than commonly difficult, at least to a mind that is comparatively unfamiliar with problems of this kind. I have, however, given my best attention to the subject, and am prepared to say that, in my opinion, the foregoing patents are valid; the subjects being patentably novel, and there being no anticipation. The patents are all for combinations of parts, but, while the parts combined are old, the result is not a mere aggregation, but a true combination; the parts being organized and working together to a common end, and producing new and highly useful results. Earlier patents were offered in which the several parts of the patents in suit repeatedly appeared; but, as they appear in different arts where

they were intended to produce different results, they do not, in my judgment, constitute an anticipation. The defense of prior use, offered to No. 503,121, is not sufficiently established. Neither, as I think, is the defense of noninfringement made out. If the patents are valid, it seems clear to me that the defendant's structure, while, of course, it is somewhat different in form, is a clear infringement upon the essential features protected by the defendant's patents.

These are the conclusions at which I have arrived, and I content myself with stating them, without recounting the steps by which my mind has been led. In the limited time at my disposal, it is not possible to elaborate the reasons that have influenced my decision; and, moreover, it is desirable to bring this long litigation to a close by hastening the inevitable appeal.

But, while I think the complainant is entitled to a decree, I am equally clear that most of the costs should fall upon his shoulders. The bill was originally filed to October sessions, 1894, and charged infringement of 11 patents, covering a large variety of differing mechanisms, and containing 279 claims; each claim, of course, being for a separate invention. The bill further averred that all these inventions were capable of conjoint use, and were conjointly used in the defendant's structure. This averment put it out of the defendant's power to demur to the bill on the ground of multifariousness: Union Switch & Signal Co. v. Philadelphia & R. R. Co. (C. C.) 69 Fed. 833. An answer was accordingly filed, which denied that the inventions were capable of conjoint use, or were conjointly used by the defendant. The complainant proceeded to make out its prima facie case, but offered no evidence concerning one of the patents named in the bill. With regard to the remaining 10 patents, the complainant testified that he had examined one of the defendant's cars, and had found that the truck infringed 87 claims,—some of each patent. With the record in this condition, the defendant proceeded to take its proofs in reply. At the first meeting called for this purpose, the complainant's counsel withdrew another patent from consideration, thus leaving 9 of the patents and 85 of the claims sued upon to stand. In reply to these claims, the defendant took a large amount of testimony, extending over 550 printed pages. The complainant then began the taking of testimony in rebuttal, but not until March, 1898, more than three years after the bill was filed, did the complainant's counsel state—as will appear upon page 205 of the complainant's proofs—that he withdrew from further consideration all the claims and patents involved in the suit, except the 5 patents and the 44 claims heretofore referred to. No amendment was ever made to the bill, and the court has never been asked for leave to withdraw the other patents and claims. Under such circumstances, it seems to me to be clear that the complainant should be obliged to pay a large part of the costs of the case. It was indefensible to file such a bill as appears upon this record, charging conjoint use of the 279 claims of the patents originally sued upon; for it is now perfectly manifest, and the complainant must have known then, that no such use was possible, or was actually made, by the defendant. And when it appeared later that the complain-

ant's proofs were not sufficient to establish infringement of more than 44 of the claims sued upon, and when, for this or for any other reason, he may have desired to withdraw from consideration the rest of the claims, it is manifest that, under the circumstances disclosed by this record, he would only have been allowed to do so upon such terms as to costs as the court might have thought proper to impose. He cannot evade these terms by the course he has seen proper to pursue. He permitted the defendant to take its testimony upon the assumption that infringement of 89 claims was charged, and it was not until after his own rebuttal testimony had proceeded over more than 100 printed pages that he saw fit to confine himself to the 44 claims that were finally pressed. It is unnecessary, I think, to do more than state the foregoing facts to justify the court in the imposition of a proportion of the costs upon the complainant. It is accordingly ordered, therefore, that he pay three-quarters of the costs, and that the defendant pay the other one-quarter.

A decree may be prepared in accordance with this opinion.